O

JS-6

# United States District Court
# Central District of California

| | |
|---|---|
| In re: | Lead Case No. 2:19-cv-01471-ODW [Consolidated with Case No. 2:19-cv-01051-ODW] |
| L. SCOTT APPAREL, INC., | |
| Debtor. | Bankruptcy Case: 2:13-bk-26021 |
| HOWARD GROBSTEIN as Liquidating Trustee of L. Scott Apparel, Inc., | **ORDER AFFIRMING THE BANKRUPTCY COURT** |
| Plaintiff, Appellee and Cross-Appellant, | |
| v. | |
| LOWELL SHARRON, an individual, and BEYOND BASICS, LLC, a California limited liability company, | |
| Defendants, Appellants and Cross-Appellees. | |

## I. INTRODUCTION

Appellants and Cross-Appellees Lowell S. Sharron ("Sharron") and Beyond Basics, LLC ("Beyond Basic") (collectively, "Appellants") appeal the Bankruptcy Court's recharacterization of debt as equity. Appellee and Cross-Appellant Howard Grobstein as Liquidating Trustee of L. Scott Apparel, Inc. ("Trustee" or "Appellee") appeal the finding that Sharron and Beyond Basics are not alter egos of one another.

The Court has jurisdiction under 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure 8001(b). For the reasons discussed below, the Court

**AFFIRMS** the Bankruptcy Court and **DISMISSES** all grounds for appeal and cross-appeal.

## I. BACKGROUND[1]

### A. Procedural Background

On June 19, 2013, one of L. Scott Apparel Inc.'s ("Debtor") vendors and two creditors filed an involuntary petition for relief pursuant to Chapter 7 of Title 11 of the United States Code against Debtor. (Appellee's Supplemental Excerpts of Record ("SER") 1042, ECF Nos. 27-1–27-11.) The Bankruptcy Court later confirmed an amended reorganization plan which provided for the creation of a liquidating trust for which Howard Grobstein was appointed liquidating trustee. (SER 1042–43.) On September 23, 2013, Sharron filed his proof of claim ("Sharron Proof of Claim"), which claims $766,783.74 for "Money loaned to Debtor, and unpaid compensation." (Appellants' Excerpts of Record ("ER") 185, ECF No. 23-1–23-5.) Sharron claimed $350,000 as a secured debt perfected by his alleged right to set off. (ER 185.)

Trustee objected to the Sharron Proof of Claim on March 3, 2015 and subsequently commenced the adversary proceeding underlying this appeal ("Adversary Proceeding"). Trustee sought to recoup book balances due from Appellants and to recharacterize a $350,000 loan from Sharron to Debtor as equity not debt. (SER 736.) Trustee and Sharron then jointly consolidated the objection with the Adversary Proceeding.

The parties filed their joint stipulation as to facts, trial occurred, and the Bankruptcy Court issued its Trial Findings and Judgment on January 29, 2019. (ER 896, 1031–35.) The judgment against Sharron and Beyond Basics totaled $567,194.13 and $502,008.46, respectively, plus pre-judgment interest of 10% per annum on both, but the Bankruptcy Court found against Trustee on the alter ego

---

[1] After considering the briefs and excerpts of record filed by each party, the Court finds that the decisional process would not be significantly aided by oral argument because the facts and legal arguments are adequately presented in the briefs and record. Fed. R. Bankr. P. 8019(b)(3).

2

claim. (ER 1031–35.) The judgment further recharacterized the debt as equity, disallowing its use by Sharron as an offset. (ER 1031–35.)

## B. Factual Background

### 1. *Debtor*

Debtor was incorporated as a California corporation on May 15, 2001 with Sharron as the primary shareholder. (ER 80.) Debtor manufactured garments, sold garments to major retailers in the junior segment, and was in business for approximately twelve years. (ER 116.) As of May 13, 2013, Sharron was Debtor's President, Secretary, Chief Financial Officer, and only Director, and Debtor's principal executive office was Sharron's residence. (ER 81.) As of June 19, 2013—when the involuntary bankruptcy petition was filed—Sharron owned 97.5% of Debtor individually and through his family trust. (ER 128.) Debtor did not hold board or shareholder meetings on an annual basis. (ER 81.)

Debtor financed operations through a factoring agreement with CIT Group/Commercial Services, Inc. ("CIT"), and through advances by Sharron. (ER 116.) Under the factoring agreement, Debtor sold accounts arising from its inventory sales and services, and CIT would advance up to 85% of the amount of sold accounts plus up to $200,000 in the aggregate. (ER 116.) Sharron personally guaranteed the factoring agreement and was therefore at personal risk for repayment of CIT's advances made under the factoring agreement. (ER 166.) Under the factoring agreement, CIT could audit debtor, access Debtor's financial records and regular reports, and terminate the factoring agreement if Debtor breached or Debtor's financial condition was compromised. (ER 116.)

In 2002, Sharron advanced to Debtor $200,000 (the "Subordinated Debt") which was recorded on Debtor's compiled financial statements as "subordinated debt-stockholder." (ER 117.) Debtor issued multiple promissory notes that modified the principal and maturity dates on the Subordinated Debt. The Subordinated Debt initially had a January 1, 2005 maturity date and accrued interest at 6% per annum.

(SER 70.) Debtor issued a new $350,000 promissory note dated April 30, 2003 with a July 1, 2005 maturity date, still at 6% interest (the "Sharron Subordinated Note"). (SER 72.) The maturity date was extended to January 1, 2010, then January 1, 2012, and finally to January 1, 2015. (SER 85, 87, 89.) The promissory notes collectively show that Debtor and Sharron extended the term from two to twelve years, and the final January 1, 2015 maturity date came due after the order for relief was entered in the bankruptcy case. At trial, Sharron and his accountant, Kabani, testified regarding the decision-making process for extending the Subordinated Debt's maturity date. Sharron testified that he delegated the decision to extend or offset to Kabani, but Kabani testified that a decision was made after mutual discussion. (ER 378, 387–89.)

Interest on the Subordinated Debt was credited by Debtor to the account designated in Debtor's QuickBooks as "1210 – Due from Officer" (the "Due from Officer Account"). (SER 1036; ER 84–85.) From 2002 until the filing of the involuntary petition, Debtor advanced funds to and incurred expenses for Sharron and his family for personal use as reflected in the Due from Officer Account. (ER 84–85.) Expenses included prepayment of $15,259 for family vehicles just before the bankruptcy filing—Sharron testified that these payments, which benefitted Sharron personally, were purposefully made when he was winding down the company. (SER 1039.)

No fixed repayment schedule existed for the Due from Officer Account. (SER 1037.) Sharron never intended to pay off the Due from Officer Account even though he had funds to do so. (ER 120–21.) As of June 28, 2013, the amount Sharron owed Debtor, (i) exclusive of interest, (ii) without regard to any setoff, and (iii) inclusive of all cash and non-cash credits pursuant to the Due from Officer Account, equaled $462,194.53. (SER 1037.)

No principal payments were made on the Subordinated Debt and Debtor's books or records do not indicate that there was a reserve for payment of the Subordinated Debt. (ER 83.) Debtor's books and records also have no record of a

payment demand and reflect that no cash payments of interest were paid to Sharron by Debtor. (ER 83.) Debtor's accountant testified that Debtor used the funds from the Subordinated Debt as working capital. (SER 1599–1601.) Sharron never attempted to offset the Subordinated Debt against the Due from Officer Account, except on Debtor's 2013 tax return where Debtor claimed to offset the Sharron Subordinated Note from the Due from Officer Account. (ER 118–19.) Sharron testified that the Subordinated Debt did not have a fixed due date and that he would allow the Subordinated Debt to remain outstanding for as long as there were amounts due from him under the Due from Officer Account. (ER 383–84.)

### 2. *Beyond Basics*

Sharron stated he opened Beyond Basics because "[w]e were in the middle of some very difficult and changing times in the apparel industry" and it was his "desire to capitalize on a new line of business for children." (ER 128.) "The products would all be made in America which was a trend that many of the largest retailers were contemplating at that time." (ER 128.) Emails between Sharron and Maren Ghalayini show that Sharron: (1) wanted to retain financial control of Beyond Basics (ER 420–21); (2) did not want Debtor and Beyond Basics to compete directly and thus required Ghalayini to sign a non-compete agreement (SER 314, 339); and (3) recognized that there was a "huge risk" in funding Beyond Basics. (SER 335.)

On August 8, 2011, the principals of Beyond Basics—Sharron, Maren Ghalayini, and Riad Ghalayini—executed the Beyond Basics Operating Agreement. (SER 1039.) Debtor and Beyond Basics are separate legal entities in different business segments and Debtor did not own interest in Beyond Basics. (SER 1034, 1040.) The members of Beyond Basics were: Lowell S. Sharron Revocable Trust (61.25%), Maren Ghalayini (33.75%) and Riad Ghalayini (5%.) (SER 1039.) The initial capitalization of Beyond Basics was Lowell S. Sharron Revocable Trust (inventory and materials valued at $72,500), and Maren Ghalayini (assets of separate

dissolved entity valued at $6,000.) (SER 1039.) Sharron did not own inventory and testified that any such inventory would have come from Debtor. (SER 1039; ER 432.)

Debtor's contributions were charged to Beyond Basics and reflected on the account designated in Debtor's QuickBooks as account "1222 – Due from Beyond Basics" (the "Due from Beyond Basics Account"). (ER 91–92.) Sharron's initial capital contribution of $50,000 was advanced by Debtor and reflected on the Due from Officer Account. (SER 280, 468.) In December 2011, Debtor contributed an additional $22,500 to Beyond Basics on Sharron's behalf. (ER 92.) Additionally, the value of Debtor's employees' labor for Beyond Basics and expenses paid on behalf of Beyond Basics was included in the Due from Beyond Basics Account. (ER 91–92, 126–30.)

On August 8, 2011, Beyond Basics and Debtor entered into the Shared Services Agreement, which provided for Debtor's payment of "direct expenses"—including manufacturing, cost of sales, payroll, and general administrative expenses—at an interest rate of 9% per annum. (SER 1040.) In consideration for Debtor's payment of "indirect expenses," Beyond Basics was to add a commission of $1.33 to what it owed Debtor for each garment shipped. (SER 1040.) Direct expenses and indirect expenses were accounted for by adding debits to the Due from Beyond Basics Account. (SER 1040.)

Beyond Basics was never profitable. (SER 1040.) Debtor funded Beyond Basics with $191,323 from October 16, 2012 to June 19, 2013. (SER 852.) Beyond Basics sustained $520,000 in losses from its inception through June 2013. (SER 968.) Beyond Basics was treated on Debtor's financial statements as a Variable Interest Entity because its equity investment at risk was insufficient to finance its activities without Debtor's financial support and Debtor performed all operating function and decisions relating to Beyond Basics. (SER 1624.)

Sharron testified that, in 2012, Debtor was going through a "rebuilding" phase, having a "tighter overhead structure," cutting staff, and "pinching pennies." (SER

1514–15.) In July 2012, earnings for the first six months of 2012 were approximately $100,000 negative and underperformed projections by nearly $300,000. (SER 199–200.) Debtor incurred its first loss as of December 31, 2012 and was projected to have an $816,000 operating loss for 2013. (SER 216–32; ER 84.)

Debtor's accountant notified Sharron on February 6, 2012 that he moved $40,000 of Debt from the Due from Beyond Basics Account to the Due from Officer Account to allow Sharron to use the pass-through tax losses from Beyond Basics on his income tax return for 2012. (ER 93.) Upon approval by Ghalayini, Sharron used 100% of the tax losses generated by Beyond Basics as a pass-through tax entity in 2013. (ER 93.) Sharron claimed the following losses on his tax returns: (1) $99,188 of the 2011 Beyond Basics aggregate loss of $161,939; (2) all the 2012 Beyond Basics loss of $138,685; (3) all the 2013 Beyond Basics loss of $126,127; and (4) all the 2014 Beyond Basics loss of $111,560. (SER 489, 531, 573, 620.)

Debtor received only one payment on the Due from Beyond Basics Account on July 24, 2013 and no records exist of any other demands. (ER 94.) Sharron expected Beyond Basics to repay Debtor only if Beyond Basics became profitable. (ER 129–130.) As of June 2013, Sharron and his wife operated Beyond Basics from their personal residence, had sales of approximately $75,000, and retained inventory with a value of approximately $50,000. (SER 1953–57.)

After June 2013, Beyond Basics had nominal overhead and did not purchase new inventory. (SER 1961-63.) Even though Sharron continued to sell inventory from Beyond Basics, he did not pay any portion of the Due from Beyond Basics Account to Debtor. (ER 497-501.) As of July 24, 2013, Beyond Basics owed Debtor, (i) exclusive of interest, and (ii) inclusive of all cash and non-cash credits, $502,008.46 based on the Due from Beyond Basics Account. (ER 94.)

## II. STANDARD OF REVIEW

A district court reviews a bankruptcy court's legal determinations de novo. *In re Olshan,* 356 F.3d 1078, 1083 (9th Cir. 2004.) However, a district court must accept

a bankruptcy court's factual findings unless those findings are clearly erroneous. *Id.* The Ninth Circuit has "held that the question of whether an advance to a corporation is debt or equity is" a factual determination that "cannot be overturned unless clearly erroneous." *Bauer v. Comm'r*, 748 F.2d 1365, 1367 (9th Cir. 1984) (quoting *A.R. Lantz Co. v. U.S.*, 424 F.2d 1330, 1333-34) (9th Cir. 1970). The Ninth Circuit has also held that "application of the alter ego doctrine is reviewed for clear error." *Towe Antique Ford Found. v. I.R.S.*, 999 F.2d 1387, 1391 (9th Cir. 1993) (citing *Wolfe v. U.S.*, 798 F.2d 1241, 1243 n.2 (9th Cir. 1986)).

To find "clear error," the error must be "manifestly unjust." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). "A manifest injustice is defined as an error in the trial court that is direct, obvious, and observable." *Brooks v. Tarsadia Hotels*, No. 3:18-cv-2290-GPC-KSC, 2020 WL 601643, at *5 (S.D. Cal. Feb. 7, 2020) (internal quotations marks omitted).

### III. DISCUSSION

**A. Whether the Bankruptcy Court Properly Recharacterized Debt as Equity**

The parties agree that a bankruptcy court may recharacterize debt as equity. *In re Daewoo Motor Am., Inc.*, 471 B.R. 721, 729 (C.D. Cal. 2012), *aff'd*, 554 F. App'x 638 (9th Cir. 2014) ("Every Circuit Court of Appeal that has addressed this issue . . . has held that a bankruptcy court may properly order the recharacterization of debt to equity") (citations omitted). However, Appellants argue that the Bankruptcy Court applied the wrong law in determining whether to recharacterize debt as equity and that the factual record does not support recharacterization. (Appellants' Br. 24-40, ECF No. 23.) The Court first determines the applicable law de novo and then applies the record to that law under a clearly erroneous standard of review. *Bauer*, 748 F.2d at 1365; *In re Olshan,* 356 F.3d at 1083.

   *1. Law Governing Recharacterization*

The Ninth Circuit refers to state law to determine the issue of recharacterization. *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1146 (9th Cir.

2013.) The parties agree with the Bankruptcy Court that California state law has not "addressed the question of when debt should be recharacterized as equity." (ER 1003); *Lewis v. Tel. Employees Credit Union*, 87 F.3d 1537, 1545 (9th Cir. 1996) ("When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court [may refer to] appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.") (internal quotations and citations omitted).

No California case establishes standards for recharacterizing debt as equity and the Restatement provides no guidance. Most jurisdictions to consider the issue apply multi-factor tests developed in federal tax law. *In re Alternate Fuels, Inc.*, 789 F.3d 1139, 1148 (10th Cir. 2015) (thirteen-factor test imported from Eleventh Circuit tax case); *In re Lothian Oil Inc.*, 650 F.3d 539, 544 (5th Cir. 2011) (stating that Texas courts imported a test from federal tax law to distinguish between debt and equity); *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 749 (6th Cir. 2001) (adopting eleven-factor test from Sixth Circuit tax case); *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006) (following *AutoStyle Plastics*); *In re Color Tile, Inc.*, No. 96-76 (HSB), 2000 WL 152129, at *4 (D. Del. Feb. 9, 2000) (seven-factor test including parties' intent.) These tests are similar as they all assign weight to factors depending on case circumstances and find no one factor dispositive. *In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d Cir. 2006) (citing *AutoStyle Plastics* approvingly but affirming use of *In Re Color Tile* seven-factor test while noting that multi-factor tests "devolve to an overarching inquiry" regarding intent).

With no published California authority addressing the issue, the Court adopts a flexible, non-exhaustive, multi-factor test, as set forth in *In Re Color Tile* by the Delaware Court of Chancery. Delaware is a foremost authority on corporate law. *Simmonds v. Credit Suisse Sec. (USA) LLC*, 638 F.3d 1072, 1089 (9th Cir. 2011) ("[T]here are particularly compelling reasons for following the Delaware Court of Chancery's decisions because it is widely recognized as the nation's leading authority

on corporate law issues.") (citing William H. Rehnquist, *The Prominence of the Delaware Court of Chancery in the State–Federal Joint Venture of Providing Justice,* 48 Bus. Law. 351 (1992)). California and many jurisdictions therefore look to Delaware for standards in unsettled areas of corporate law. *In re AWTR Liquidation Inc.*, 548 B.R. 300, 311 (Bankr. C.D. Cal. 2016) ("California courts often look to decisions from Delaware.") (citing *Swingless Golf Club Corp. v. Taylor*, 679 F.Supp.2d 1060, 1070 (N.D. Cal. 2009) ("Claims of corporate waste in California are based upon Delaware state law.") (additional citations omitted).

According to Appellants, the Bankruptcy Court erred in applying Delaware law and should have applied California contract law. (Appellants' Br. 25-28.) But Appellants cite inapposite authority, discount the prevalence of multi-factor tests, and in fact urge focus on the factor that differentiates the *In Re Color Tile* test from its counterparts—discernment of intent. *In re Roomstores of Phoenix, L.L.C.*, No. 2:15-BK-15898-DPC, 2020 WL 211399, at *6 (Bankr. D. Ariz. Jan. 10, 2020) ("Delaware's 7 factor test differs a bit from both of these tests in that it explicitly incorporates a requirement that the court discern the parties' intent.") (citations omitted). The Court is unpersuaded by Appellants and finds all or most of the *In Re Color Tile* factors applicable to recharacterization cases, as set forth below.

Thus, the Court turns to whether the Bankruptcy Court's recharacterization under *In Re Color Tile* was clearly erroneous.

2. *Application of Law Governing Recharacterization*

"Whether a security constitutes equity or debt depends on the interpretation of the contract between the corporation and the security holders." *In re Color Tile, Inc.*, 2000 WL 152129, at *4 (citations omitted). "In interpreting the contract, courts consider numerous factors, including: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors;

and (7) certainty of payment in the event of the corporation's insolvency or liquidation." *Id.* (citations omitted).

The Bankruptcy Court recharacterized Sharron's "loan" of $350,000 to Debtor as equity, finding that only the first factor disfavored recharacterization; factors two, three, four, and seven favored recharacterization; and factors five and six were neutral. (ER 1004–1007.) The parties agree, as does the Court, that factors five and six are irrelevant here. (Appellee's Br. 33, ECF No. 27; Appellants' Br. 35.) Appellants argue that the Bankruptcy Court's analysis concerning factors two through four was "deeply flawed" and that it "completely ignored the unique facts of this case" with respect to factor seven. (Appellants' Br. 33–40.)

The Court addresses each relevant factor in turn.

a. Parties' Intent

The most significant and persuasive factor supporting recharacterization is the intent of the parties, as the record establishes that Sharron intended the loan to be an equity contribution. No principal or interest payments were made despite Sharron's ability to require such payments as the Chief Executive Officer, Chief Financial Officer, Secretary, and Director of Debtor. (ER 81, 94.) Undisputed facts and testimony show that no payment demand was made over the course of the loan, no reserve was created, and the loan was needed and used as working capital. (ER 83; SER 1599–1601.) Notably, Sharron testified that he did not expect repayment according to any timeline but, rather, only upon profitability. (ER 129–30.) This behavior is inconsistent with that of a lender extending a $350,000 loan, but evidences intent to treat the "loan" as an equity contribution.

While no single factor is dispositive, the evidence in support of this factor, on its own, all but conclusively supports that the Bankruptcy Court's recharacterization was not clearly erroneous. *Smith v. Clark Cty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013) (clear error occurs where the court "is left with the definite and firm conviction that a mistake has been committed.")

b. Fixed Maturity Date

Appellants argue that the Bankruptcy Court "completely and totally erred" by finding no fixed maturity date. (Appellants Br. 35.) In support, Appellants note that the instruments *did* have maturity dates and ask the Court to disregard the ten-year extension beyond the original maturity date. (Appellants Br. 35.) Appellants offer no authority for this approach. It is undisputed that the maturity date was extended multiple times, collectively changing the term from two to twelve years. (SER 85, 87, 89.) The Court cannot permit an entity to characterize a contribution as a loan rather than equity where it initially provided a fixed maturity date and then extended the date on numerous occasions for a decade as doing so contravene the purpose of recharacterization. *In re First NLC Fin. Servs., LLC*, 415 B.R. 874, 879 (Bankr. S.D. Fla. 2009) ("Recharacterization prevents an equity investor from labeling its contribution as a loan, and subverting the Bankruptcy Code's critical priority system by guaranteeing itself a higher priority—and a larger recovery—should the debtor file for bankruptcy.") (internal citation omitted).

Thus, the Court does not find that Appellants' argument concerning the existence of an initial fixed maturity date demonstrates that the Bankruptcy Court clearly erred in siding with Appellee on this factor.

c. Right to Enforce Payment of Principal and Interest

Appellants correctly contend that analysis of the third factor applies to the fourth factor. (Appellants' Br. 35.) The fact that Sharron extended the maturity date for ten years supports the Bankruptcy Court's conclusion that that the "loan" was treated as equity. This evidence, coupled with Sharron's failure to enforce payment or control payment timing in a commercially reasonable manner, suggest there was no right to enforce payment. As such, this factor favors recharacterization.

d. Certainty of Payment

For many of the same reasons as factors two through four, the record suggests no certainty of payment in the event of insolvency or liquidation. *In re HH*

*Liquidation, LLC*, 590 B.R. 211, 296 (Bankr. D. Del. 2018) ("The 'certainty of payment' factor cuts straight to what a lender cares about when making a loan, especially in a distressed situation.") Namely, no security existed for the Sharron Subordinated Note; the maturity date was regularly changing; and, no reserve existed for payment of the Subordinated Debt. Furthermore, Appellants set forth no competent evidence to support that the Bankruptcy Court's finding was clearly erroneous with respect to this factor. Thus, this factor favors recharacterization.

     e. Name Given to the Instrument

  The parties agree with the Bankruptcy Court that the name of the instruments and their verbiage refer to a debt and, thus, this factor cuts against recharacterization. (Appellants' Br. 31–32; Appellee's Br. 34.) It is undisputed that instruments referred to the funds as "Subordinated Debt"; used the terms "Creditor," "Debtor" and "Indebtedness"; and titled the amount "2130 – Long Term Loan" in Debtor's QuickBooks. (ER 82–82.) Hence, this factor disfavors recharacterization.

  Despite the references to debt in the instruments, this Court agrees with the Bankruptcy Court that "[t]reating the 'loan' as an actual loan would require the court to ignore Sharron's behavior—behavior that deviates from that typical of a noteholder and which more closely aligns with that of a capital contributor." (ER 1006.) Considering each factor and the circumstances of this case, there is insufficient evidence to find that the Bankruptcy Court committed clear error in ordering recharacterization. *In re Jorgensen*, 479 B.R. 79, 87 (B.A.P. 9th Cir. 2012) (a bankruptcy court's "finding is clearly erroneous when the reviewing court's interpretation of the facts was illogical, implausible, or without support in the record") (citation omitted). Accordingly, the Court **AFFIRMS** the Bankruptcy Court's recharacterization of $350,000 as equity.

**B. Whether the Bankruptcy Court's Alter Ego Finding was Clearly Erroneous.**

  Appellee argues that because "the record demonstrates substantial unity of interest between Appellants, and an unjust result would flow from treating them

separately, the Bankruptcy Court erred in ruling that Sharron and Beyond Basics are not alter egos of one another." (Appellee's Br. 27.)

California's alter ego doctrine "acts as a procedural mechanism by which an individual can be held jointly liable for the wrongdoing of his or her corporate alter ego." *Double Bogey, L.P. v. Enea*, 794 F.3d 1047, 1052 (9th Cir. 2015). "Alter ego is an extreme remedy, sparingly used." *Sonora Diamond Corp. v. Super. Ct.*, 83 Cal. App. 4th 523, 539 (2000). "Thus, the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." *Mesler v. Bragg Mgmt. Co.*, 39 Cal. 3d 290, 301 (1985)). An alter ego relationship requires "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and [its owner] no longer exist[,] and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Daewoo Elecs. Am. Inc. v. Opta Corp.*, 875 F.3d 1241, 1249 (9th Cir. 2017) (citation omitted).

California courts consider many factors concerning unity of interest and ownership. *See, e.g.*, *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838–40 (1962) (listing over 20 factors.) Those factors include inadequate capitalization; commingling of funds and other assets; use of the corporation "as a mere conduit" for the affairs of the owner; disregard of corporate formalities; sole ownership of all the stock in a corporation by one individual; lack of segregation of corporate records; the use of the same office or business location; and the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another. *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002.) No factor is determinative. *Id.* Regarding inequitable result, a plaintiff must show "that an injustice would result from the recognition of separate corporate identities, and '[d]ifficulty in enforcing a judgment or collecting a debt does not satisfy this standard.'" *Id.* (quoting *Sonora Diamond*, 83 Cal. App. 4th at 539.)

Appellee contends that trial evidence established several factors supporting unity of interest between Sharron and Beyond Basics: (1) "commingling"; (2) "asset diversion for personal use…"; (3) "manipulating funding from another source as though it came from Sharron when Sharron actually contributed nothing to Beyond Basics"; (4) "identical equitable ownership and manipulation of another entities' employees and materials to benefit himself through Beyond Basics"; (5) "undercapitalization"; (6) "domination/control"; (7) "disregard of legal formalities"; and (8) "manipulation of assets." (Appellee's Reply 4–9, ECF No. 32.)

There is noteworthy evidence to suggest Sharron and Beyond Basics were alter egos of one another. The record shows commingling of funds and diversion of assets, as Sharron claimed losses generated by Beyond Basics on his personal tax return even though Debtor was funding Beyond Basics. (SER 489, 531, 573, 620.) The evidence further shows that Sharron, as majority owner, exercised control over Beyond Basics's financial decisions and used his positions with Debtor to cause Debtor to contribute funds and labor towards Beyond Basics's operations. (ER 91–92, 126–30.) Beyond Basics was still unprofitable and Sharron did not expect Beyond Basics to repay him until it became profitable. (ER 129–30.) Even after Beyond Basics was defunct and owed Debtor substantial sums, Sharron continued to sell inventory from Beyond Basics and retained the proceeds. (SER 1953–57; ER 497–501.)

But this evidence is insufficient for the Court to find that the Bankruptcy Court committed clear error in declining to grant Appellee the extreme remedy of disregarding the corporate form. Appellee does not dispute that Sharron did not have sole ownership of Beyond Basics and did not conceal his ownership or Beyond Basics's business activity. Nor can Appellee point to evidence of illegal activity on Beyond Basics's behalf or evidence showing that Beyond Basics's formation and operation was intended to shield Sharron from personal liability. Appellee does not dispute that the entities used separate bank accounts, Sharron did not personally own Beyond Basics's inventory, and Beyond Basics observed corporate formalities in part.

As to undercapitalization, Appellee stresses that Beyond Basics was never profitable, consistently sustained losses or underperformed projections, and that Sharron had no imminent expectation of repayment. (Appellee's Br. 22-23.) But Appellee fails to meet his burden in establishing the type of undercapitalization required to justify alter ego liability. *Perfect 10, Inc. v. Giganews, Inc.*, No. 11-cv-07098-AB (SHX), 2015 WL 12710753, at *8 (C.D. Cal. June 3, 2015), *aff'd,* 847 F.3d 657 (9th Cir. 2017) (without evidence of undercapitalization "to the point of being a shell corporation" a court "cannot impose alter ego liability . . . no matter how closely [the two entities'] interests were aligned"). A lack of profits, financial performance, or expectations of repayment fall far short of establishing that Beyond Basics was a "shell corporation" created and used for Sharron's personal benefit. *Id.* Indeed, Appellee focuses on Debtor's allegedly unwise funding of Beyond Basics but this undermine Appellee's position on undercapitalization. The lack of evidence demonstrating the requisite level of undercapitalization is especially probative. *Boeing Co. v. KB Yuzhnoye*, No. 13-cv-00730-ABA-JWX, 2016 WL 2851297, at *25 (C.D. Cal. May 13, 2016) (citing *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 552 (Bankr. D. Del. 2012) ("Undercapitalization and insolvency are the most relevant factors in determining 'whether the corporation was established to defraud its creditors or [some] other improper purpose such as avoiding the risks known to be attendant to a type of business.'").

Appellee, observing that Sharron controlled the resources Debtor gave to Beyond Basics, similarly fails to satisfy Appellee's burden. An owner's domination and control over a corporation matters when "the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased." *Firstmark Capital Corp. v. Hempel Fin. Corp.*, 859 F.2d 92, 94 (9th Cir. 1988) (quoting *Wood v. Elling Corp.*, 20 Cal. 3d 353, 365 n.9 (1977)). While the record establishes that Sharron maintained pervasive control of Beyond Basics, there is

insufficient evidence to find that the separateness of Beyond Basics and Sharron "ceased" at any relevant time, and certainly insufficient evidence to overturn the Bankruptcy Court's evidence-based determination.

A finding of alter ego liability is further belied by the fact that Appellee's arguments largely focus on an alleged unity of interest and ownership between Debtor and Beyond Basics, rather than Sharron and Beyond Basics. (Appellee's Reply 6-9) ("Debtor contributed its own employees' labor toward Beyond Basics' operations…; Sharron caused the Debtor to fund his $50,000 initial capital contribution and his additional $22,5000 capital contribution to Beyond Basics…; Sharron controlled both the resources given to Beyond Basics by the Debtor and whether Beyond Basics would repay the amounts owing to the Debtor under the Shared Services Agreement…; Sharron caused the Debtor to fund Beyond Basics at a time when Sharron conceded that the Debtor was 'pinching pennies…'"). While these arguments are probative to a unity of interest and ownership between Sharron and Beyond Basics, the Bankruptcy Court had sufficient reason to reject Appellee's contention that Sharron's control over both entities establishes a unity of interest between Sharron and Beyond Basics. (ER 999–1001) ("Trustee argues in part that the unity of interest between Debtor and Beyond Basics is evidence of unity of interest between Sharron and Beyond Basics. The court rejects Trustee's contention. The evidence suggests that B[eyond ]B[asics] and Debtor were intended to remain separate . . . If there was a unity of interest between Beyond Basics and Debtor, it is unclear why Beyond Basics would have agreed to pay a commission to Debtor and documented the services performed under the Shared Services Agreement.")

Applying the relevant factors to the record, the Court concludes that the Bankruptcy Court did not commit clear error in finding that there is not a sufficient unity of interest and ownership between Beyond Basics and Sharron to justify the extreme remedy of piercing the corporate veil. Accordingly, the Court **AFFIRMS** the

Bankruptcy Court's alter ego finding and does not address the second prong concerning inequitable result.

### IV. CONCLUSION

For the reasons discussed above, the Bankruptcy Court is **AFFIRMED** and all grounds for appeal and cross-appeal are **DISMISSED**.

**IT IS SO ORDERED.**

April 13, 2020

_____
**OTIS D. WRIGHT, II
UNITED STATES DISTRICT JUDGE**